# Rees *versus* Jackson.

1. Where a note has on it the full amount of revenue stamps cancelled by the initials of the defendant, and the execution of the note is proved, this is sufficient to take the note to a jury.

2. A note had on it seven stamps; the initials of the drawer being on all, four were proved to be his; the remaining three were not proved; the question whether he had cancelled the three was for the jury.

3. R. purchased stock of J. in consequence of a forged telegram. Evidence in this case which required the submission to the jury, of the question of J.'s connection with the telegram.

March 21st 1870. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Error to the Court of Common Pleas of *Monroe county:* No. 409, to January Term 1869.

This was an action of assumpsit, by A. Reeves Jackson against William S. Rees, brought January 2d 1868, on a promissory note, dated July 24th 1865, drawn by the defendant in favor of the plaintiff for $2250, payable fifty days after date. The note was part of the consideration for 500 shares of the stock of the Pennsylvania Imperial Oil Company. The defence was that the defendant was induced to purchase the stock by means of a forged telegram, purporting to have been sent by Dr. W. D. Stroud of

Philadelphia, which, it was alleged, the plaintiff had procured to be sent to him. Both parties were residents in Stroudsburg.

The cause was tried February 25th 1869, before Barrett, P. J.

The note had on it four 25 cents revenue stamps, and three of 5 cents; on each of the stamps were the initials "W. S. R." A witness for the plaintiff called to prove the defendant's signature to the note, testified on cross-examination that the initials on the larger stamps were made by the defendant, that he could not say the smaller ones were his; they differed from the others and from the signature. The defendant on this account objected to the admission of the note in evidence. The court admitted it, and sealed a bill of exceptions. The plaintiff having read the note, rested.

The defendant then gave evidence that a despatch, from the line of the American Telegraph Company, dated July 24th 1865, and shown to witnesses, had been received at $3\frac{1}{2}$ P. M. on the day of its date, at the Stroudsburg depot, about a mile from the town, that the operator employed Charles Troch to carry it to the defendant, that he delivered it to the defendant in the presence of J. H. Stroud, and that both read it; this was after dark of the day.

J. H. Stroud testified that after dark on the 24th of July and after reading the despatch, the defendant went down towards the plaintiff's office, and returned in a short time and showed witness a certificate for 500 shares of oil stock with the name of the plaintiff signed to the transfer; that the witness, who was cashier of the Stroudsburg Bank, next day cashed a check (which he identified), dated July 24th 1865, drawn by defendant in favor of plaintiff, written on the face " payment on Penna. Imperial oil stock 500 shares," and endorsed by plaintiff. The defendant then read the check in evidence.

S. S. Dreher (the certificate of stock and endorsed transfer being shown him), testified that he was the witness to the transfer; that on the Tuesday or Wednesday previously to the transfer, which was on Monday, the plaintiff told him he had been thinking of going into a mining company and would like to dispose of some of his Imperial oil stock; he asked witness if he knew any one who wished to buy; witness said he did not unless it was Mr. Rees, who had recently purchased some from Esquire Botree; witness told plaintiff he was under the impression that defendant had got his information about the stock from Dr. Stroud; plaintiff asked witness to tell the defendant that he had his stock for sale; witness on the next Saturday, which was the Saturday before July 24th 1865, told defendant that the plaintiff wanted to sell his Imperial oil stock.

B. S. Jacoby testified that in conversation with the plaintiff on the afternoon the stock was transferred to the defendant, it was

said the defendant wanted to buy some Imperial oil stock; witness wanted plaintiff to sell witness's stock; plaintiff said : " Rees is coming into my office to-night, and I will speak to him about it. He said he wanted to sell his.   In the evening of that same day I went into Dr. Jackson's office after supper.   We talked over the matter again.   I told him I was very anxious to sell mine—would like to have the money for it.   I told him I would sell mine for $5.25.   He said I was foolish, as I could as well get $5.50.   He said he would not sell his for less than $5.50.   He said after he had sold his to Rees at $5.50 he would mention to him that he could have mine at $5.25.   While we were talking Rees came into the office and the conversation ceased on that subject.   I remained in a while.   I think Jackson stepped out for a short time.   After he came back I left the office and left the Doctor and Rees in the office.   I saw Dr. Jackson again that evening in front of Marsh's Hotel.   He came up from towards his office and stopped.   He called me to one side and told me that he had sold his stock to Rees, and he said you can sell yours to him if you give him time."

Dr. W. D. Stroud testified that he was a cousin of plaintiff's wife and a cousin of defendant ; he never sent the despatch to defendant or any other about oil or any thing else; a few days after the date of the despatch, witness and defendant went to the office of the American Telegraph Company, and in company with G. W. Meyers, a clerk in the office, searched amongst the messages and could not find the original of the despatch.

Meyers testified that the despatch had been brought to the office by a boy in July 1865, and described the appearance of the paper containing the despatch.

J. Merrihew, manager of the Telegraph Company, testified, from the books of the company, that a despatch from W. D. Stroud to W. S. Rees, Stroudsburg, was sent from their office on the 24th of July 1865, that he had searched diligently and had been unable to find the original.

M. L. Abel testified that in July 1865, he was employed in the office of James Boys, a stock broker in Philadelphia ; that he carried a despatch for Boys in July 1865 to the American Telegraph office, signed W. D. Stroud, addressed to William Rees, Stroudsburg, and gave it to Meyers ; the description of the paper was similar to that given by Meyers ; it was to buy oil stock ; witness never took any other despatch for Stroudsburg, nor carried any other despatch for Boys to that office ; all the other despatches of Boys were sent to the Bankers' & Brokers' Telegraph office ; witness had seen plaintiff three or four times at Boys' office in the summer of 1865 ; had heard Boys speak of defendant and Dr. Stroud before that.

The defendant gave in evidence, by other witnesses, that they

[Rees v. Jackson.]

had frequently seen Boys and the plaintiff together familiarly and intimately.

The defendant offered in evidence the telegram, with the record from the telegraph office, as proved by Merrihew. The telegram was as follows:—

"July 24th 1865.                              Received 3.30 P. M.
       "By Telegraph from Philadelphia.
  "To Wm. S. Rees, Stroudsburg.
"No. 1.
  "The Penn'a Imperial have made a big strike. Buy all the stock you can under ten (10) dollars.
                                        "WM. D. STROUD."

The offer was objected to, rejected, and a bill of exceptions sealed.

He then gave in evidence the certificate of 500 shares of Imperial oil stock, with transfer endorsed in blank, signed by plaintiff, and dated July 24th 1865.

He offered to prove that at the date of the transfer the stock was without value; he again offered the telegram and telegraph book, to be followed by evidence that as soon as defendant discovered the forgery and within a week after the note was given, he offered to return the stock to the plaintiff on receiving back the note and money, informing him that he had purchased on the faith of the telegram, which proved to be forged; also to prove that the oil company had not made "a strike," and the stock was valueless; also that Boys was a fugitive from justice on account of having sent the despatch. All these offers were rejected by the court, and several bills of exception sealed.

The court charged : * * "The note upon its face imports a consideration. It is alleged that it was given for a purchase of oil stock, and that the stock was at the time worthless—something more must be shown to affect the consideration. If it was a fair sale the consideration was fixed by the buyer and he is concluded by it. Either fraud or mistake must be proved to avoid the payment of the note. The law presumes that the defendant was aware of what he was doing when he made the contract. If there was deceit, misrepresentation or fraud of any kind made use of to effect the sale or procure the note, it would be a good defence. Fraud is alleged, but the burthen of proof is on the defendant to show it. That a forged despatch was received by Rees from Philadelphia on the day he made the purchase is in evidence. Upon the receipt of the despatch he immediately called on the plaintiff and purchased his stock. He was acting, as he supposed, on private information. If it had been true he would have made a good bargain off the plaintiff. As it turned out to be untrue he made a bad bargain for himself. The evidence in relation to the despatch

[Rees *v.* Jackson.]

was admitted under objection, but with the promise that the plaintiff should be connected with the writing and sending of the despatch before it was offered in evidence. The despatch being between other parties and being wholly irrelevant to this issue, unless the plaintiff's connection with it could be shown, the largest latitude has been given to the defendants for the purpose of enabling them to make the plaintiff responsible. [He has failed to show that Dr. Jackson was even in a position to direct it, and having failed to do so, it became the duty of the court to reject the despatch as evidence.] Even if the despatch could have been admitted in evidence it could not have affected the plaintiff's right to recover unless he was implicated in the act of sending it. Suspicion, however strong, is not evidence. No other fraud is alleged except that connected with the despatch. [There being no evidence of plaintiff's complicity with the act, there is no evidence to go to the jury on the subject.] [We cannot submit a fact to the jury to be found, in relation to which there is no evidence, and that is this case.]

"Although the stock may have been, as time has shown, wholly worthless, it is no defence to this action, unless there was either mistake or fraud. If the defendant, in the purchase, exercised his own judgment, uninfluenced by any improper conduct on the part of the plaintiff, no matter where or how he obtained his information, he must suffer the consequences. The law cannot relieve him from a mere bad bargain. Having failed to make such a defence, [the jury are instructed to find a verdict in favor of the plaintiff for the amount of the note and interest.]"

The verdict was for the plaintiff for $2715.

The defendant took out a writ of error, and assigned for error the admission of the note, the rejection of his offers of evidence and the portions of the charge of the court enclosed in brackets.

*W. Davis* and *H. Green*, for plaintiff in error.—The plaintiff should have proved affirmatively the cancellation of the stamps: Act of Congress July 13th 1866; Tripp *v.* Bishop, 6 P. F. Smith 424; McGovern *v.* Hoesback, 3 Id. 176; Walsh *v.* Carwell, Leg. Int., April 24th 1868, p. 33; Wigham *v.* Pickett, Am. L. Reg., November 1869, p. 701. Fraud in fact is purely a question for the jury: Garrigues *v.* Harris, 5 Harris 350; Repsher *v.* Wattson, Id. 368; Thomas *v.* Thomas, 9 Id. 317; McIldowny *v.* Williams, 4 Casey 492; Kaine *v.* Weigley, 10 Harris 183; Balt. & O. Railroad *v.* Hoge, 10 Casey 214. Frauds do not ordinarily admit of direct proof; things remaining unproved as well as those proved may be evidence in a case: Myers *v.* Hart, 10 Watts 104; Stauffer *v.* Young, 3 Wright 459; Huntzinger *v.* Harper, 8 Id. 204; Deakers *v.* Temple, 5 Id. 242; Dark *v.* Hanks (cited) Chitty on Bills 265; Maples *v.* Brown, 12 Wright 458.

[Rees v. Jackson.]

*S. Holmes, Jr.*, and *E. J. Fox*, for defendant in error.—The court should not submit to a jury what would at most but produce a suspicion of a fact: Stouffer *v.* Latshaw, 2 Watts 167 ; Malson *v.* Fry, 1 Id. 435 ; Bradley *v.* Grosh, 8 Barr 49 ; Moore *v.* Miller, Id. 285 ; Gilchrist *v.* Rogers, 6 W. & S. 488 ; Stine *v.* Sherk, 1 Id. 201 ; Irwin *v.* Shoemaker, 8 Id. 76 ; Benford *v.* Sanner, 4 Wright 10.

The opinion of the court was delivered, May 5th 1870, by

AGNEW, J.—In ruling out the telegram of the 24th of July 1865 to the defendant, the court severed the only link between the note in suit and the fraud that begat it. It is on this ruling only that the refusal of the offer of the transfer of the stock as the consideration of the note can be supported. Indeed, there was already ample evidence in the case of this as the consideration, consisting of the admissions of Jackson of the sale of the stock on the 24th of July, the number of shares, and price of $5.50 per share, the clerk writing the sale of 500 shares, the note for $2250, and the transfer endorsed on the certificate, all dated on the same 24th day of July. Nor can there be any doubt that the forged and fraudulent telegram induced Rees to buy the stock. There is ample evidence of this in the testimony of James H. Stroud and Benjamin S. Jacoby. The only question, therefore, is, whether Jackson was privy to the sending of the telegram to Rees. There was sufficient evidence of this fact to be submitted to the jury. It was not a mere spark dying out in the moment of its birth, but a stream of light thrown directly upon the plaintiff, the strength and clearness of which the jury alone could determine. Men have been convicted and punished on circumstances not more strong. Let us examine the evidence with a view to see whether it had sufficient strength to carry it to the jury. That the telegram was false and fraudulent is clear. That it came from one Boys, a broker in Philadelphia, is evident. These being clear facts, the inquiry arises and must be answered satisfactorily, how did it happen Boys should address Rees in Dr. Stroud's name just at the moment when Jackson was anxious to sell Imperial oil stock, and to invest in mining stock ? Why did Boys think of Rees at all ? How did he know that Rees would buy stock, and how did he know that he wanted Imperial oil stock ? Boys lived in Philadelphia and Rees in Stroudsburg, a hundred miles or so apart. And if by any possibility we might suppose Boys knew these things, by some act of divination or spiritualistic insight, how did he know or think of Dr. Stroud as a fit person to influence Rees? And what motive had Boys to act at all ? It seems to be impossible to answer these questions except on one supposition, viz., that some one made the suggestion to Boys. A jury would be justified in this conclusion, and then the

[Rees v. Jackson.]

inquiry would be, who made the suggestion? The first and most natural conclusion on the evidence would be that it came from some one in Stroudsburg, who had an interest in the result. Up to this point a jury would scarcely hesitate, and then the question is, does the evidence point to the plaintiff? Who had a motive to act on Rees? Jackson was the owner of Imperial oil stock, and desired to sell it. This is the kind of stock mentioned in the telegram. · Who was likely to think of Rees as a purchaser of this stock? Jackson had inquired for a purchaser, and was told Rees would probably buy it. Who was operating on Rees to buy before the telegram came? Jackson sent word to Rees that his Imperial stock was for sale. But Rees failed to come at this call. Some days intervened— this is evident, for Dreher delivered Jackson's message on the Saturday previous to the 24th of July; and it was on the Tuesday or Wednesday preceding Jackson spoke to Dreher. Failing to respond to the message, how was Rees to be influenced to buy? A big strike of oil and a telegram were natural means. Who thought of Dr. Stroud? In the conversations between Jackson and Dreher the latter had told Jackson, that in buying Bortree's stock, he thought, Rees was acting on information from Dr. Stroud? Who is Stroud? The cousin and friend of Rees and a cousin of Jackson's wife. Who then was so likely to be thought of as Stroud, or one so fit for the purpose? But a fit instrument to operate in Philadelphia must be found. That Boys was the man is indisputable, for he did it. This is followed by the proof that Boys and Jackson were acquaintances and associates, and that Jackson visited Boys's office in Philadelphia several times in the summer of 1865; and if the witnesses are believed, their association was of the free and easy kind. So far, the evidence affords considerable probability to the belief that Jackson made the suggestion to Boys to send the telegram to Rees. But in cases of circumstantial evidence there is generally one fact which forms the clinch, and gives a decisive effect to the whole chain. That fact seems to be so here. The telegram arrived at the depot, about a mile away, at 3.30 P. M. It was given by the operator to Troch, to be handed to Rees. Troch did not deliver it till about 8 o'clock, at dark. In a few minutes Rees started off directly to Jackson's office, found him and Jacoby there, and the stock was purchased the same evening. But Jacoby, the same person, and therefore there is no room for a mistake of time, testifies that in the afternoon of the same day Jackson told him that Rees was coming to his office that night, and he would speak to Rees about the purchase of Jacoby's stock, of which they were then talking. How did Jackson know that Rees would be at his office that night? It was a week or more before that he had sent the word by Dreher to Rees. There is no evidence of any previous arrangement, or conversation about the stock. It was evidently the telegram of

[Rees v. Jackson.]

the big strike of the Imperial which set Rees in motion, and this was not till dark.   How then did Jackson know in the afternoon that Rees was to come to his office, unless attributable to the presumed effect the telegram would have on Rees ?   If this be so, and the jury and not the court must determine the fact, it is evident that Jackson has furnished evidence of his own knowledge that such a telegram would be sent to Rees.   Admitting then that fraud is not to be presumed or to be found on vague or slight conjecture, and that the doctrine is exploded, as we have said several times, of the sufficiency of a mere spark or scintilla of. evidence to go to the jury, yet we have here a chain of circumstances strong enough to bear the weight of the case into the jury box, and lodge it there for their decision.   How far it is full proof of the plaintiff's complicity it will be for the jury to say.   This carries with it all the other assignments of error except that as to the stamps.   As to it we think there is no error in receiving the note in evidence.   The signature to the note was the defendant's ; and the initials on the larger stamps were his ; and the note was stamped to the requisite amount.   This was clearly primâ facie evidence to carry the note to the jury.   The primâ facie·presumption arising from the execution of the note, the full amount of stamps affixed, their actual cancellation, and the initials of the defendant on a part of the stamps, would prevent the court from taking from the jury the fact of an authorized cancellation of the smaller stamps.

Judgment reversed, and *venire facias de novo* awarded.